# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**
           **Plaintiff,**

      **v.**                                             **Case No.  14-CR-156**

**DAVE ANGLIN**
           **Defendant.**

---

## DECISION AND ORDER

On December 17, 2013, a confidential informant ("CI") working with law enforcement told agents that defendant Dave Anglin planned to commit a robbery that morning. Police stopped defendant a few hours later, finding a pistol in his waistband, and the government charged him with felon in possession of a firearm in Case No. 14-CR-2. Defendant moved to suppress the gun and his post-arrest statements, arguing that the police violated his Fourth Amendment rights. Magistrate Judge Callahan held a hearing, then issued a recommendation that the motion be denied. District Judge Randa adopted the recommendation, and defendant then entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress. That case is set for sentencing next month.

Meanwhile, in the present case the government obtained a three count indictment charging defendant with conspiring to obstruct commerce by robbery; robbery affecting commerce; and discharging a firearm during a crime of violence. Defendant again moved to suppress the evidence seized from his person on December 17, 2013, as well as his post-arrest statements. The parties agreed that Magistrate Judge Joseph, assigned to the pre-trial proceeding in this case, could rely on the record developed in Case No. 14-CR-2, as the issues

were identical. Magistrate Judge Joseph also recommended that the motion be denied. Defendant objects. My review is de novo. Fed. R. Crim. P. 59(b).

## I. FACTS

The facts, which are set forth in full in Magistrate Judge Joseph's report and recommendation, are essentially undisputed. I accordingly adopt those findings and present an abbreviated version herein.

On December 10, 2013, the CI called ATF Agent Hankins, stating that defendant and defendant's brother Michael Anglin were trying to recruit the CI to help them commit armed robberies. Hankins and a Milwaukee police officer interviewed the CI on December 13, 2014, and the CI reported that he was currently confined with defendant in a federal halfway house (Parsons House). A criminal history query revealed that defendant was then completing a federal prison sentence for bank robbery. The CI stated that he had befriended the Anglin brothers, and that defendant was particularly eager to conduct any kind of robbery because he had no money. The CI said that the Anglins wanted him to carry a firearm that they would provide, and that on December 7 or 8, 2013, the Anglins showed him two black assault rifles located in the backseat of a silver/gray SUV driven by Michael Anglin and a Glock pistol on Michael's person. The CI stated that he had previously ridden in that SUV, traveling with the Anglins to an apartment complex where Michael Anglin said he lived; a records check showed that the Anglins' mother lived at that apartment complex, and that she owned a 2002 Acura SUV which matched the description given by the CI of the vehicle Michael Anglin drove. The CI further stated that defendant was sometimes picked up from the halfway house in a white Escalade driven by his girlfriend, "Star," and law enforcement later observed defendant getting into a vehicle matching the description the CI provided; a record check confirmed that the white

Escalade was registered to "Starmiqua N. Broom" at an address on North 4th Street in Milwaukee.

On December 16, 2013, the CI again met with officers, reporting that defendant wanted to rob "something" within a couple of days. The officers instructed the CI to encourage the Anglins to show him a specific robbery target location prior to any attempt and provided the CI with a digital recording device.

On December 17, 2014, at approximately 5:00 a.m., Agent Hankins saw a text message from the CI that read, "They trying to do something in the morning what I do." Hankins called the CI, and the CI stated that defendant was determined to conduct an armed robbery that morning sometime after 8:00 a.m. when they were released from the halfway house. Hankins told the CI to go with the Anglins so that he could keep law enforcement apprised of their movements and activities.

Hankins located the Acura SUV outside of Michael Anglin's residence at approximately 5:35 a.m. At about 8:05 a.m., Hankins observed a black male matching Michael Anglin's booking photo enter the Acura and drive away, heading east. Law enforcement tried to follow but lost track of the Acura in traffic.

While monitoring the Acura, Hankins heard from the CI, who informed him that defendant left the halfway house shortly after 8:00 a.m. The CI stated that he called defendant and asked where he was, and defendant told the CI that he needed to do something for his girlfriend but that he would meet the CI and Michael Anglin after he finished so that they could team up for an armed robbery. Defendant further told the CI that Michael Anglin would be picking the CI up from the halfway house. The CI called Michael Anglin, who confirmed that he would pick up the CI to conduct a robbery. The CI told Hankins that one of the Anglin

3

brothers told him that the target of the robbery was going to be a drug house near 74th and Capitol in Milwaukee; the CI said that he had previously driven by the location with the Anglin brothers, but he could not remember the exact street or address. The CI stated that defendant instructed him to walk to the corner of Fond du Lac Avenue and Center Street and wait there for Michael Anglin to pick him up.

At about 8:48 a.m., surveillance units gathered in the area of Fond du Lac Avenue and Center Street observed the silver Acura approach and stop, and the CI got in the front passenger seat. The Acura traveled north/northwest on Fond du Lac Avenue, and the police later stopped the vehicle and took the occupants into custody.

Meanwhile, other officers gathered near the residence of defendant's girlfriend (where the CI said defendant would be) and set up surveillance. These officers were instructed to locate defendant and take him into custody. At about 10:00 a.m., an individual matching defendant's description exited the residence, along with several other individuals (a young woman, a teenaged boy, and a child), and walked toward the driver's side of the Escalade while talking on his cell phone. The officers moved in, boxing in the Escalade, and approaching with weapons drawn. One of the officers opened the driver's side door of the Escalade and ordered defendant out and onto the ground, grabbing defendant's wrist and guiding him to the ground. Defendant complied. The officer handcuffed defendant, had him stand up, walked him to the back of the Escalade, and then patted him down, locating a .9 millimeter pistol concealed in defendant's waistband.

## II. DISCUSSION

### A. Collateral Estoppel

The government argues that I need not address the merits because defendant is collaterally estopped from re-litigating this stop motion based on Judge Randa's denial of an identical filing in Case No. 14-CR-2. Collateral estoppel can apply in criminal cases, but the doctrine generally requires a final judgment in the previous action, see Loera v. United States, 714 F.3d 1025, 1029 (7th Cir. 2013), which does not yet exist in Case No. 14-CR-2. I will therefore address the merits of the motion.

### B. Merits

In his motion, defendant argued that the police arrested him without probable cause. Magistrate Judge Joseph agreed that prior to the discovery of the gun the police lacked probable cause to arrest but found that the officers effected a valid investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), pursuant to which they located the pistol.[1] In his objections, defendant concedes that the police had reasonable suspicion to stop him to investigate his possible involvement in a robbery, but he argues that the police exceeded the permissible scope of a Terry stop when they boxed him in, approached with weapons drawn, ordered him the ground, and handcuffed him prior to conducting the pat-down. He contends that the police could have used less forceful means to dispel their suspicions. See United States v. Novak,

---

[1]Because Fourth Amendment standards are objective, the subjective intent of the officers to take defendant into custody does not control. See United States v. Garcia, 376 F.3d 648, 651 (7th Cir. 2004) ("The fourth amendment asks whether a particular search was 'reasonable' rather than whether a suspect was 'under arrest.'"); United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001) ("The subjective intent of the agents is not relevant to either part of the inquiry: it does not impact the validity of the initial investigative stop, and it has no bearing on determining whether police conduct transformed an investigative stop into a de facto arrest.").

870 F.2d 1345, 1352 (7th Cir. 1989) ("To qualify as a mere Terry stop, a detention must be limited in scope and executed through the least restrictive means.").

Despite the reference to "least restrictive means" in some of the cases, the Seventh Circuit has upheld Terry stops involving the use of handcuffs, drawing of weapons, and other measures often associated with custodial arrests. United States v. Askew, 403 F.3d 496, 507 (7th Cir. 2005) (citing United States v. Tilmon, 19 F.3d 1221, 1224-25 (7th Cir. 1994)). The court has held that the use of such measures can be appropriate if the surrounding circumstances give rise to a justifiable fear for personal safety. See, e.g., United States v. Smith, 697 F.3d 625, 632 (7th Cir. 2012) (finding it reasonable for officers conducting an investigatory stop to approach with guns drawn and handcuff the defendant, a suspect in an armed bank robbery); Askew, 403 F.3d at 508-09 (finding that the police acted reasonably in neutralizing the defendant, a drug suspect, by surrounding his car and approaching with weapons drawn); United States v. Stewart, 388 F.3d 1079, 1085 (7th Cir. 2004) (finding that it was not unreasonable for officers to handcuff and detain the defendant, a suspect in a recent armed bank robbery, pending the arrival of detectives); United States v. Vega, 72 F.3d 507, 515 (7th Cir. 1995) (finding that it was reasonable for agents to approach a suspect in a cocaine importation conspiracy with weapons drawn); Tilmon, 19 F.3d at 1226-28 (finding that police acted reasonably in stopping the defendant, a suspect in a recent robbery, ordering him out of the car and to the ground at gun point, and handcuffing him).

When officers use force to effect a seizure, the court must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake, considering (1) the severity of the suspected crime, (2) whether the suspect posed an immediate threat to the safety of the officer or others,

6

and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Brown v. City of Milwaukee, 288 F. Supp. 2d 962, 970 (E.D. Wis. 2003) (citing Graham v. Connor, 490 U.S. 386, 396 (1989); Jacobs v. City of Chicago, 215 F.3d 758, 773 (7th Cir. 2000)). Ultimately, the court must decide whether the means used to seize the person were excessive in relation to the danger he posed. Id.

### 1.    Seriousness of the Suspected Crime

Defendant indicates that, unlike in Tilmon, the case upon which Magistrate Judge Joseph primarily relied, the suspected offense here was inchoate. As the government notes, however, a person on his way to commit an armed robbery may pose the same danger as someone who just completed such an offense.

Defendant further argues that the previously untested CI provided only vague information about the proposed robbery, which the police failed to corroborate. While the CI did not know all of the specifics of the robbery plan, he did provide significant details. He told Hankins that the crime was to happen that morning – a home invasion style robbery of a drug house near 74th and Capitol, a location the CI had previously visited with the Anglins; the CI further indicated that the Anglin brothers wanted him to carry a weapon, and they had previously shown him three firearms in Michael Anglin's vehicle. The police corroborated significant aspects of the CI's information, including the residence of Michael Anglin and his mother, the mother's ownership of the silver SUV, and defendant's girlfriend's ownership of the white Escalade; they also confirmed defendant's prior record for bank robbery, for which he was confined in the halfway house with the CI. Finally, the CI was able to predict certain actions by the Anglin brothers, i.e., that Michael Aglin would pick the CI up in the area of Fond du Lac and Center, and that defendant would travel to his girlfriend's residence before joining

7

the others to commit the robbery.  See Ala. v. White, 496 U.S. 325, 332 (1990) (noting that a tipster's ability to predict the suspect's future behavior demonstrates inside information, enhancing reliability).  The CI was also willing to record his interactions with the Anglins, further enhancing his reliability.

### 2. Immediacy of the Threat

Defendant notes that the CI saw firearms in the silver SUV Michael Anglin used but not on defendant's person or in the white Escalade defendant drove.  However, the CI reported that defendant escorted him to Michael Anglin's SUV to show him the guns, suggesting that the brothers had joint control over the weapons.  Moreover, the police suspected defendant of planning an armed robbery, a crime that by its very nature suggests the presence and use of weapons.  See United States v. Barnett, 505 F.3d 637, 640 (7th Cir. 2007) ("Though not every Terry stop justifies a frisk, some crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime.").  The officers also knew that defendant had previously been convicted of armed bank robbery.

Defendant argues that he posed a reduced threat given the presence of his girlfriend and the two minors and because his brother had already been arrested.  However, the police had specific information that defendant was at the time on his way to meet his brother and the CI to commit a home invasion style robbery that morning; defendant did not then know that his brother had been arrested, and the police could reasonably assume that he remained armed and potentially dangerous.  The police also had legitimate concerns about losing defendant in traffic (as they previously had his brother) if allowed to drive away, providing a good reason for them to act quickly.

8

### 3. Cooperativeness with the Police

Defendant notes that he was cooperative with the police. Nevertheless, the Terry portion of the stop lasted just a few seconds before the police discovered the firearm and thus obtained probable cause to arrest. See United States v. Robinson, 30 F.3d 774, 784 (7th Cir. 1994) (noting the importance of the length of the encounter under Terry). Cooperativeness alone did not make it unreasonable for the officers to briefly use forceful means to disarm defendant. See United States v. Taylor, 162 F.3d 12, 21 (1st Cir. 1998) (finding the police were entitled to take swift measures to discover the true facts and neutralize the threat of harm if it materialized).

Defendant contends that given the number of officers involved they could have acted less aggressively, e.g., by having him exit the vehicle and raise his hands to be frisked rather than taking him to the ground and handcuffing him.[2] However, given the circumstances faced by the officers, this marginally greater intrusion on defendant's liberty did not make the seizure unreasonable. See id. (upholding Terry stop involving 10 to 12 officers, who blocked the defendant in, removed him from the car, placed him on the ground, and frisked him for weapons).

On de novo review, I agree with the magistrate judge that it was not unreasonable for the officers, faced with this potentially dangerous situation, to effectuate the stop in the manner they did. Accordingly, the motion to suppress must be denied.

---

[2]Defendant also notes that the police could have waited for him to return to the halfway house, rather than conducting a tactical arrest on the street. But the police had no way of knowing that defendant would go back to Parson's House.

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 16) is adopted, and defendant's motion to suppress (R. 10) is **DENIED**.

Dated at Milwaukee, Wisconsin this 8th day of December, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge